# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re CAR CARE DEPOT, LLC, et al.<br><br>*Debtor.*<br>_____<br><br>ALAN MEINSTER,<br><br>*Appellant*,<br><br>v.<br><br>CHARLES FORMAN, as Trustee,<br><br>*Appellee.* | Civil Action No.: 16-2214 (PGS)<br><br>MEMORANDUM AND ORDER |

SHERIDAN, U.S.D.J.

This matter comes before the Court on appeal from the Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"). Appellant Alan Meinster ("Meinster" or "Appellant") appeals from the four Orders of the Bankruptcy Court granting Trustee Barry Frost ("Frost"), in his capacity as Chapter 7 Bankruptcy trustee, authorization to continue the bankruptcy proceedings of Car Care Depot, LLC ("Car Care") and Tiger Car Wash, LLC ("Tiger Wash"). After reviewing the record and arguments, this Court affirms the Orders of the Bankruptcy Court.

## **Background**

This dispute concerns an alleged broker's commission that was never memorialized in writing due to intervening events. Consequently, several material facts in this case are disputed..

Appellant Alan Meinster is a licensed real estate broker in the State of New Jersey with a principle office in Mercerville, NJ. (Joint Appendix ("Joint Appx") at 250, Dkt 22-1). He is also a part owner of the restaurant "Rossi's" in Hamilton Township. *Id*.

Appellee Charles Forman ("Forman") is a member of Forman Holt Eliades & Youngman

LLC, and served as the Chapter 11 Trustee during the Chapter 11 filings of Car Care and Tiger Wash. (Declaration of Charles M. Forman in Support of Trustee's Motion, Joint Appx at 92, Dkt 22-1).

Barry Frost is an attorney who has served as the Chapter 7 trustee for Car Care and Tiger Wash after the Chapter 11 proceedings were converted into Chapter 7 liquidation. (Appellee's Brief at 1, Dkt 25).

Interested Party Marvin Ginsberg ("Ginsberg") was, at the time of the original bankruptcy filing, the majority owner of Tiger Wash and Car Care, owning ninety-five (95) percent of the business. (Appellant's Brief at 16, Dkt 21). Ginsberg's son, Marc Ginsberg, owned the remaining five (5) percent. *Id.*

Interested Party Christopher Vernon ("Vernon") is the buyer of Tiger Wash. (Certification of Christopher S. Vernon, Joint Appx at 487, Dkt 22-1). Vernon is the owner of Mercer Management, a real estate management firm that manages various types of properties, including commercial ones. (Examination of Christopher Vernon at 53-54, Dkt 17).

## **Appellant Alan Meinster**

Per the certification submitted by Appellant, the relevant events occurred sometime around March 2015. (March 16, 2016 Certification of Alan Meinster, Joint Appx at 250, Dkt 22-1). As a part owner of Rossi's, Appellant knew Ginsberg as a result of his occasional visits to the restaurant. *Id*. During one such visit, Appellant engaged in conversation with Ginsberg, during which Ginsberg "very specifically described his need to sell two (2) of his carwashes . . . one of which was the Princeton Tiger Car Wash." *Id*.

At this point, Appellant claims to have told Ginsberg of his occupation as a real estate broker in the State of New Jersey, and would be willing to find Ginsberg a buyer in return for a ten percent commission. *Id*. Appellant claims Ginsberg then "unequivocally agreed to pay the commission." *Id*.

Appellant then "went right to work," already having a prospective buyer in mind who "had a particular interest in the car wash business." *Id*. That prospective buyer was Christopher Vernon. *Id*. After Appellant made a phone call to Vernon to explain the situation and explained he was acting as a broker, Vernon expressed "an exceedingly high level of interest." *Id* at 251. Appellant then called Ginsberg to arrange a meeting with Vernon at Tiger Wash the next day. *Id*. The meeting reportedly "went forward . . . and resulted in Mr. Ginsberg securing a ready, willing, and able buyer." *Id.*

Appellant knew Vernon well enough to describe Vernon as a highly respected businessman and negotiator who typically handled his own negotiations without a broker. *Id*. Appellant admits he normally would have been more active in the transactional process; however, Appellant suffered a medical emergency which caused significant disability and a long recuperation period. As a result, Appellant did not follow-up on his prior discussion with Ginsberg. *Id*. More specifically, a medical emergency occurred soon after the discussions with Ginsberg and Vernon.

"Within days of having made the introduction of [Vernon] to [Ginsberg]," Appellant was sitting at his kitchen table one night at 3:45 AM when he began to suffer from heart attack like symptoms, later identified as dissection of the ascending aorta. *Id.* at 251-52. Appellant was rushed to the hospital, underwent open heart surgery for eight to ten hours, and then spent two days in a medically induced coma. *Id*. Appellant reports not "even think[ing] about returning to work for a period of six [6] months." *Id*. Appellant reports that he has yet to fully recover. *Id*.

Appellant certifies that "by matter of fate and fortuitousness" he became aware of the movement in the Ginsberg-Vernon deal. *Id*. Appellant reports that on March 8, 2016, he received a phone call from Vernon expressing enthusiasm about closing the deal. *Id.* at 252-53. Surprised by the lack of communication from either Vernon or Ginsberg regarding developments in the deal, Appellant phoned Ginsberg who allegedly informed Appellant that because his desired price was not met, there would be no commission. *Id*.

It is as a result of these events that Appellant contends that he is a creditor to the Tiger Wash bankruptcy proceedings in the amount of $350,000.00, or ten (10) percent of the final $3.5 million sale price. (Appellant's Brief at 1-2, Dkt 21). The bankruptcy proceeding has already paid out a substantial sum of the total fund, leaving approximately $380,000.00 remaining with which to pay Appellant should his claim be found valid. *Id.* at 3.

## **Trustee Charles M. Forman**

On October 2, 2015, the Office of the United States Trustee appointed Forman as trustee of the Chapter 11 estates for Tiger Wash and Car Care, which had voluntarily filed for chapter 11 bankruptcy on August 28, 2015. (Certification of Charles M. Forman, Joint Appx at 260, Dkt 22-1). Forman had no prior dealings with Appellant in past, and was thus subsequently surprised when Appellant filed a motion asking the Bankruptcy Court for an order to reconsider the sale of Tiger Wash assets. *Id.* at 261.

Prior to his appointment, Forman notes that Car Care had authorized the business entity Bobrodan, Inc. d/b/a Ross Brothers to serve as brokers for the sale of Car Care's Metuchen assets. *Id*. No other brokers were noted at the time. *Id*.

Forman met with David Wander ("Wander"), attorney for Marvin and Marc Ginsberg, shortly after his appointment to review third party offers for the car washes' assets. *Id*. One such offer for the assets was for $3.5 million by Vernon. *Id*. Forman reportedly then worked to "market and sell all of the assets of the Debtors and their affiliates." *Id.* at 262.

Forman deposed Marc Ginsberg on November 5, 2015. During this examination, he testified that prior to entering bankruptcy, he and his father Marvin had already attempted to liquidate their assets. *Id*. Marc Ginsberg also testified that "there was no broker associated with the offer by Christopher Vernon to purchase the Debtors' assets." *Id*.

Forman conducted an auction in his office on February 25, 2016, where Vernon's offer of $3.5 million was the highest and best offer received, at which point Forman executed a contract with Vernon. *Id*. The Metuchen assets of Car Care were sold for $3.9 million, the best offer submitted by a separate party. (Appellee's Brief at 3, Dkt 25). Included in this contract was a clause that stated there was no associated broker and that they would both indemnify the other in the event of legal action arising out of the transaction. (Certification of Charles M. Forman, Joint Appx at 263, Dkt 22-1).

On March 8, 2016, the Bankruptcy Court entered an order authorizing the sale to Vernon, as well as an amended order on March 17, 2016 authorizing the sale to Vernon or "any entity to be formed by him."*Id*. Forman subsequently received $3,472,175.42 on March 18, 2016 when the sale to Vernon closed, the total amount inclusive of the sales deposit, net real property tax, and other assorted costs. *Id.* at 264.

### Interested Party Christopher Vernon

In his submitted certification, Vernon reports that while he has known the Appellant for a number of years "in business and as an acquaintance," he was not aware that Appellant had a real estate license until he (Vernon) received a copy of Appellant's motion requesting reconsideration of the sales order. (Certification of Christopher Vernon, Joint Appx at 487, Dkt 22-1). Vernon states that he was unable to recall exactly how he came to meet Ginsberg. *Id*.

Vernon also reported that while he did have "casual conversations" about the car wash purchase with Appellant, he did not recall any event that would have indicated Appellant was entitled to a broker's commission. *Id*. Vernon emphasized that upon finding out Appellant was asserting a claim to a broker's commission, he was more than surprised as he had no knowledge of Appellant being involved in the car wash transaction at all. (Examination of Christopher Vernon at 35, Dkt 17).

## Interested Party Marvin Ginsberg

In his examination, Ginsberg mentioned that there was a meeting of some nature one night at Rossi's between himself and Appellant. (Examination of Marvin Ginsberg at 12-13, Dkt 18). Though he could not provide an exact date, Ginsberg was able to determine the meeting took place sometime after May of 2014, but before the bankruptcy proceedings began in August of 2015. *Id* at 14-15. This coincides with the March 2015 time frame given by Appellant. The meeting reportedly was less than three minutes in length, but centered on Ginsberg's car wash. *Id.* at 13.

Ginsberg noted that Appellant had mentioned having a prospective buyer who was interested in his car wash. *Id*. Upon hearing this, Ginsberg gave the Appellant his phone number to arrange a call sometime within the next week. *Id.* at 17. Appellant had the prospective buyer, Vernon, call Ginsberg. *Id.* at 13. Ginsberg specified that during this call, Vernon mentioned that he had become aware of the car wash's sale, and that the Appellant had suggested he (Vernon) call Ginsberg. *Id*. Originally, Ginsberg reported that Vernon had made mention of an advertisement, but corrected himself and specified that the news of Tiger Wash's sale was being spread verbally. *Id*.

When discussing the specifics of the broker commission, Ginsberg stated that the subject of a commission did arise during his three minute meeting with the appellant. *Id.* at 26. Ginsberg noted that during the discussion, Ginsberg told the Appellant he was looking for $4.5 million for the sale and would grant a five (5) percent commission. *Id*. Reportedly, the Appellant did not say anything in response to this arrangement, nor did he nod his head, shake hands with Ginsberg, or anything else to indicate an affirmative response, such that Ginsberg noted "We never had a deal." *Id*. at 26-27.

After this meeting, Ginsberg could not recall meeting or speaking with the Appellant about the matter again, but did indicate that he spoke with the Appellant's business partner and informed him "[there was] no deal." *Id.* at 25.

## Analysis

In reviewing appeals from Bankruptcy Court, this Court reviews findings of fact under a standard of clear error and legal conclusions under a *de novo* standard. *See In re Sharon Steel Corp.,* 871 F.2d 1217, 1223 (3d Cir. 1989). A factual finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Cellnet Data Systems, Inc.,* 327 F.3d 242, 244 (3d Cir. 2003) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948)). This Court must accept the Bankruptcy Court's findings of historical or narrative facts unless clear error is found, but also exercises "plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *See Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101-02 (3d Cir. 1981).

Questions of law are reviewed under a *de novo* standard. *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp,* 891 F.2d 66, 69 (3d Cir. 1989); *Universal Minerals, Inc. v. C.A. Hughes &Co.,* 669 F.2d 98, 102 (3d Cir. 1981). For determinations that involve mixed questions of law and fact, a district court must apply a mixed standard of review. *Mellon Bank, N.A. v. Metro Commc'n, Inc.,* 945 F.2d 635, 642 (3d Cir. 1981). Additionally, the Bankruptcy Court's exercises of discretion are reviewed for abuse thereof. *Kool, Mann, Coffee & Co. v. Coffey,* 300 F.3d 340, 353, 44 V.I. 419 (3d Cir. 2002).

Both Appellant and Appellee have submitted papers, each raising issues for this Court to address. The nature of said issues ranges from the Bankruptcy Court's alleged abuse of discretion to the timeliness of filings. However, this Court finds that all of these secondary issues appear to stem from a single, central issue: whether Appellant is entitled to a broker's commission based on the facts and law. This memo will primarily address the arguments related to this single issue, pointing to additional issues as necessary.

# Appellant's Claim to a Broker Commission

The statutory authority governing real estate broker agreements in New Jersey is §25:1-16 of the New Jersey Statute of Frauds ("the statute"). As it pertains to real estate brokers and not business brokers, it reads as follows:

> N.J. Stat. § 25:1-16.  Commissions of real estate broker and business broker, writing required
>
> a.   As used in this section:
>
> [Non-relevant definitions omitted]
>
> "Real estate broker" means a licensed real estate broker or other person performing the services of a real estate agent or broker.
>
> [Non-relevant definitions omitted]
>
> b.   Except as provided in subsection d. of this section, a real estate broker who acts as agent or broker on behalf of a principal for the transfer of an interest in real estate, including lease interests for less than three years, is entitled to a commission only if before or after the transfer the authority of the broker is given or recognized in a writing signed by the principal or the principal's authorized agent, and the writing states either the amount or the rate of commission. For the purposes of this subsection, the interest of a mortgagee or lien or is not an interest in real estate.
>
> [Section c pertaining to business brokers omitted]
>
> d.   A broker who acts pursuant to an oral agreement is entitled to a commission only if:
>
> (1)   within five days after making the oral agreement and before the transfer or sale, the broker serves the principal with a written notice which states that its terms are those of the prior oral agreement including the rate or amount of commission to be paid; and
>
> (2)  before the principal serves the broker with a written rejection of the oral agreement, the broker either effects the transfer or sale, or, in good faith, enters negotiations with a prospective party who later effects the transfer or sale.

> e. The notices provided for in this section shall be served either personally, or by registered or certified mail, at the last known address of the person to be served.

The statute is very clear in its requirements. In order to have a valid, state recognized claim to a commission, the broker must ensure that he obtain the agreed upon arrangement in writing from the principal. Failing to obtain the agreement in writing from the onset, however, can be remedied. The broker may do so via the single exception within the statute, subsection (d), which holds that a broker that acts pursuant to an oral agreement can secure his valid claim to a commission if: (1) the broker secures the agreement in writing within five days of the oral agreement so long as the transfer or sale has not yet occurred, and (2) the broker effects the transfer, sale, or enters into good faith negotiations with a prospective party before the original principal rejects the oral agreement in writing. This is the only exception set forth in the statute.

While all parties present some variation in the facts, one thing that they unanimously agree upon is that there was no signed agreement specifying any terms of a broker commission between Appellant and other party.

There remains dispute over the subject and nature of the short meeting sometime around March 2015 between Ginsberg and Appellant. Appellant claims he informed Ginsberg he would be willing to work for ten percent commission. (March 16, 2016 Certification of Alan Meinster, Joint Appx at 250, Dkt 22-1). Ginsberg claims that he offered Appellant a commission of five percent. (Examination of Marvin Ginsberg at 26, Dkt 18). However, because no writing specifying the terms of the commission agreement was signed, the exact rate is, for all intents and purposes, a moot point. The relevant writing establishing a right to commission is nonexistent. In addition, no written notice stating terms was ever sent, leaving the section (d) exception unfulfilled.

During the April 15, 2015 motion hearing in Bankruptcy Court, Appellant admits "[t]here was no writing. We've never disputed that there's no writing." (Transcript of April 15, 2015 Hearing at 6,

Dkt 32). Appellant then argued that "the state statute says there doesn't have to be a writing. There's an exception. And the exception is -- there had to be a writing unless there can't be one." *Id*. This appears to be a misstatement of the section (d) five-day grace period.

Appellant argued that "there couldn't be a writing because Mr. Meinster almost died." *Id*. While this Court certainly sympathizes with the Appellant in regard to his medical situation, the statute does not provide any leeway for any equitable remedy absent an agreement specifying commission terms in writing. Were this Court to find such exception to the strict writing requirement, it would be directly opposing the clear language set forth by the New Jersey State Legislature.

It is regrettable that the factual timeline could not be more specific, especially with regard to the materials submitted during the course of the original bankruptcy proceeding. Appellant's brief states that Appellant's medical crisis occurred "[w]ithin days" of the supposed meeting between Ginsberg and Appellant. (Appellant's Brief at 12, Dkt 21). Appellant's certification elaborates that the medical crisis occurred "[w]ithin days of having made the introduction of [Vernon] to [Ginsberg], at 3:45 AM at [Appellant's] kitchen table[.]"(March 16, 2016 Certification of Alan Meinster, Joint Appx at 251, Dkt 22-1). A more accurate number of the days between the introduction and medical crisis could have assisted in considering the effort Appellant used in trying to acquire the writing.

Appellant also argues that even absent a broker's agreement in writing, recovery should still be possible by means of quantum meruit doctrine. (Appellant's Brief at 25, Dkt 21. Citing *Weichert Co. Realtors v. Ryan*, Appellant argues that Appellant may recover via quantum meruit as he served as the "efficient procuring cause" of the transaction. *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 441 (1992). The *Weichert* case was decided in 1992 before significant statutory changes set forth in N.J.S.A. 25:1-16 were enacted in 1995. The statutory amendments effectively undermine the *Weichert* rationale. More specifically, the New Jersey legislature

repealed N.J.S.A. § 25:1-9 when it passed a new measure with stricter commission requirements, N.J.S.A. § 25:1-16, in 1995. As the Appellate Division concisely described the change, this "revision of the Statute of Frauds requires a signed writing when a broker seeks a commission from a 'principle' as distinct from only a seller, expanding the reach of the statute to commissions sought from buyers, sellers, or owners." *Id*. As a result, the 1995 statutory revision eliminated one of the key factual points, the buyer/seller distinction, that allowed the *Weichert* court to allow recovery via quantum meruit. In this case, the statute of frauds prohibits quantum meruit recovery.

Again, while this Court sympathizes with Appellant in the circumstances that led to today, this Court is bound by New Jersey statute in this matter, and the statute clearly calls for a broker to abide by a strict set of requirements. Failure to abide by those requirements takes one out of the protections of the statute. It is a well-reasoned decision of the Bankruptcy Court. There is no clear error of law or fact.

## ORDER

This matter having come before the Court on the appeal of the Bankruptcy Court by Appellant Alan Meinster, and the Court having considered the submissions of the parties, and for good cause having been shown;

IT IS on the 7th day of November, 2017;

ORDERED the Bankruptcy Court Orders are affirmed. The Clerk is directed to close this case.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.